Lisa Marie MAZUR, a Minor, in her own right, and Anthony Mazur and Edna Mazur, as Parents and Guardians, and in their own right, Plaintiffs,

v.

MERCK & CO., INC., Defendant.

Civ. A. No. 85–6494.

United States District Court, E.D. Pennsylvania.

June 29, 1990.

David R. Dearden, Sprague, Higgins & Creamer, Philadelphia, Pa., for plaintiffs.

Kenneth C. Frazier, Joanne Lahner, Sandra L. Ykema, Philadelphia, Pa., for defendant.

## OPINION

DITTER, District Judge.

Plaintiffs Lisa Marie Mazur and her parents, Anthony and Edna Mazur, claim that Lisa contracted subacute sclerosing panencephalitis ("SSPE"), a debilitating, terminal disease of the central nervous system, as a result of an inoculation with a measles, mumps, and rubella vaccine manufactured by defendant Merck & Co., Inc. Before me is defendant's motion for summary judgment and to exclude plaintiffs' expert testimony.

The Mazurs brought this diversity action asserting claims of strict liability and negligence for both design and manufacturing defects and for failure to provide an adequate warning, breach and reckless breach

of the implied warranties of merchantability and fitness for a particular purpose, intentional and negligent misrepresentation, and negligent infliction of emotional distress. They seek compensatory and punitive damages.

Merck moves for summary judgment and for exclusion of the expert testimony of plaintiffs' witnesses.[1] It contends that federal regulation of vaccine manufacturing, distributing, and labeling preempts the Mazurs' tort claims in their entirety. Alternatively, Merck maintains that the tort claims of the Mazur parents are barred by the applicable Pennsylvania statute of limitations, 42 Pa.C.S.A. § 5524(2) and (7). It also argues that I should find as a matter of law that it did not breach the duty to warn recipients of the vaccine of its risks.

After considering the facts presented by the parties in a light most favorable to the plaintiffs, the motion for partial summary judgment will be denied in part. As I will explain more fully below, I find that Congress did not preempt state tort claims asserted by a victim of an adverse reaction to a Food and Drug Administration-approved vaccine. A reasonable jury could find for either side on the statute of limitations issue. However, I will reserve judgment on the question of whether Merck has shown as a matter of law that it did not breach its duty to warn of the dangers associated with the vaccine.

## I. FACTS

In response to a measles epidemic among school children in Philadelphia in the late 1970's, the City of Philadelphia, Department of Public Health ("Health Department") proposed a regulation that would require all children attending any school in Philadelphia to be vaccinated against certain pediatric diseases as a condition of continued school attendance. Affidavit of Robert G. Sharrar, M.D., ¶ 4, attached as Merck's exhibit B ("Sharrar aff."). The School Board of Health adopted the regulation and authorized the Health Department to exclude any student in kindergarten through twelfth grade from any Philadelphia school, public or private, if he or she was not vaccinated against measles, mumps, rubella, polio, diphtheria, and tetanus or had not naturally acquired immunity by having the disease. Sharrar aff. at ¶ 5. School nurses were instructed to review the health records of approximately 300,000 students to determine the vaccines each one needed, if any, and to obtain written permission from parents to have their child vaccinated. *Id.* at ¶ 15. Parents were required to document previous immunizations or prior illnesses. If adequate proof was not forthcoming, the child was considered unimmunized and was later vaccinated. *Id.* at ¶ 16.

The Health Department, through Dr. Sharrar, contacted the United States Center for Disease Control ("CDC") of the Department of Health and Human Services for assistance in designing a program for the children. *Id.* at ¶ 7. Following a recommendation of the CDC, Dr. Sharrar decided that combined vaccines would be used in the inoculation program. He chose M–M–R II ("MMR II") as the vaccine for the simultaneous immunization against measles, mumps, and rubella. *Id.* at ¶ 8.

MMR II is manufactured by Merck under a license from the Food and Drug Administration ("FDA"). MMR II is a live virus vaccine for immunization against all three childhood diseases. The measles portion of MMR II contains an attenuated line of measles virus, which when injected into the body causes it to generate antibodies to ward off a measles infection. MMR II is packaged in containers which include an insert describing the risks associated with

---

**1.** Merck styles its motion as one for summary judgment. I presume that Merck intended that its motion would effectively end the litigation, at least at the district court level. I do not see it that way, however. Summary judgment on all of the Mazurs' claims would be appropriate only if I found that the extensive federal regulation of vaccines preempted all of their claims or

if I found that the Mazurs could not prove that the MMR II vaccine caused Lisa's injuries. If not, there are some claims, such as the design defect charge, that were not addressed by the parties in their briefs and remain viable. Therefore, I will treat Merck's motion as one for partial summary judgment.

the vaccine's use. The April, 1981, package insert contained the following pertinent information about the risk of contracting SSPE from the MMR II vaccine:

> There have been reports of subacute sclerosing panencephalitis (SSPE) in children who did not have a history of natural measles but did receive measles vaccine. Some of these cases may have resulted from unrecognized measles in the first year of life or possibly from the measles vaccination. Based on estimated nationwide measles vaccination distribution, the association of SSPE cases to measles vaccination is about one case per million vaccine doses distributed. This is far less than the association with natural measles, 5–10 cases of SSPE per million cases of measles. The results of a retrospective case-controlled study conducted by the Center for Disease Control suggest that the overall effect of measles vaccine has been to protect against SSPE by preventing measles with its inherent risk of SSPE.

According to the package circular, the vaccine is indicated for immunization "in children 15 months of age or older, and adults." Additionally, it included the following paragraph about revaccination:

> Based on available evidence, there is no reason to routinely revaccinate children originally vaccinated when 12 months of age or older; however, children vaccinated when younger than 12 months of age should be revaccinated. The decision to revaccinate should be based on evaluation of each individual case.

The FDA approved the package circular before it was included with the vaccine. Affidavit of William B. Freilich, ¶ 4, attached as Merck's exhibit A ("Freilich aff.").

The MMR II vaccines were purchased from Merck by the CDC at Dr. Sharrar's request. At first, Merck would not sell the vaccines to the CDC. Merck relented when the CDC contractually agreed either to assure that a physician would be present at inoculation or to provide MMR II recipients or their parents with what Merck and it believed to be an adequate warning of the risks associated with MMR II immunization.[2] Freilich aff. at ¶ 15. The CDC drafted an "Important Information Statement" to be sent to all parents of school age children. *Id.* at ¶ 22 and exhibit 6. The statement was designed to allow parents to weigh the benefits against the known risks of MMR II vaccination in a manner they would ordinarily comprehend. The Important Information Statement was sent home to parents via their children. Merck's exhibit R at 45.

Lisa Mazur, the Mazurs' fourth child, was born on August 11, 1969. Lisa's medical history prior to 1982 was for the most part unremarkable. Lisa's three siblings all had measles and German measles (rubella) prior to Lisa's birth. Mazurs' exhibit 2 at 59. On October 11, 1973, Lisa received a measles vaccine and a German measles vaccine from her private physician. Prior to February, 1982, Lisa had not received a mumps vaccine and had not naturally acquired immunity to the mumps. From late 1979 through January, 1982, Lisa was treated on a number of occasions for colds, a sore throat, allergies, and pharyngitis. On January 8, 1982, Lisa underwent a tonsillectomy. During that time, she was a student at the Morrison School in Philadelphia.

Mrs. Mazur claims that she never received the Important Information Statement or any other warning about the risks of MMR II inoculation. Yet, she admits that she saw two documents apprising her of the immunization program. Mazurs' ex-

---

**2.** The CDC and Merck signed three purchase contracts for the MMR II vaccines to be provided to the Health Department. Each contract contained the following language:

> [CDC], represents and agrees that it will (1) take all appropriate steps to assure that all vaccine supplied to various locations within the 50 states, ... pursuant to the terms of this contract, shall be administered to each patient on the basis of an individualized medical judgment by a physician, or (2) take all appropriate steps to provide to such a patient (or to the patient's parent or guardian) meaningful warnings relating to the risks and benefits of vaccination, in form and language understandable to such patient, parent or guardian. Freilich aff. at ¶ 17 and exhibits 3, 4, and 5.

hibit 2 at 106–108. One of the two documents she received was a letter from the School District with an attached student immunization record and parental permission form. Mazurs' exhibit 10. The letter explains the immunization program and what each parent must do either to allow inoculation or to prevent it. *Id.* Mrs. Mazur states that she read the letter and permission form but refused to sign it or return it unsigned to the school. Mazurs' exhibit 2 at 109. In any event, upon learning of the immunization program, Mrs. Mazur called the school principal and the Board of Education to inform them that Lisa had received a measles vaccine in 1973 and to protest any revaccination.[3] Mazurs' exhibit 2 at 109–21. As a precaution, Mrs. Mazur kept Lisa out of school for approximately a week before sending her back just prior to the day of the immunization program at Lisa's school. *Id.* at 117. Mrs. Mazur claims that she did not provide written or oral permission for Lisa to receive the MMR II vaccination. Nevertheless, Lisa received an MMR II vaccine shot on February 26, 1982.

On September 7, 1983, Lisa was admitted to St. Christopher's Hospital for Children in Philadelphia for tests because of "personality changes in the past six months with abnormal movements in the past few weeks." Mazurs' exhibit 14. After reviewing Lisa's electroencephalogram results, one of her doctors stated that SSPE should be "seriously consider[ed]" as a cause of her physical and behavioral problems.[4] Mazurs' exhibit 14. In late September, 1983, Lisa's doctors at St. Christopher's made a "presumptive" diagnosis of SSPE. Mazurs' exhibit 15. On November 2, 1983, another doctor, who examined Lisa

at her parents' request, agreed with the earlier diagnosis of SSPE.

## II. PREEMPTION

Merck contends that the pervasive scheme of federal regulation governing the production, labeling, and distribution of vaccines impliedly preempts the Mazurs' Pennsylvania tort claims for breach of the duty to warn recipients of a vaccine of its hazards. The concept of preemption has its roots in the supremacy clause of the Constitution, art. VI, cl. 2. There are two types of preemption: express and implied. *Hillsborough County v. Automated Medical Laboratories,* 471 U.S. 707, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985).[5]

Implied preemption may arise in either of two ways. First, Congress may indicate an intent to occupy an entire field of regulation, in which case the states must leave all regulatory activity in that area to the federal government. *Fidelity Federal Savings & Loan Assoc. v. De la Cuesta,* 458 U.S. 141, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982). Second, Congress may preempt state law to the extent that state law actually conflicts with federal law. Such a conflict arises when compliance with both federal and state law is impossible or when state law frustrates the purposes of federal law. *Michigan Canners and Freezers Assoc. v. Agricultural Marketing and Bargaining Board,* 467 U.S. 461, 104 S.Ct. 2518, 81 L.Ed.2d 399 (1984).

There is no question that federal regulation of vaccines, such as MMR II, is comprehensive. MMR II is subject to the provisions of the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 *et seq,* and the Public Health Service Act ("PHSA"), 42 U.S.C. § 215 *et seq.* Both

---

**3.** As a result of the fact that the MMR II vaccine is a combined vaccine, Lisa would receive a second dose of measles and rubella virus.

**4.** SSPE is a fatal, slowly progressing, inflammatory disease of the central nervous system. SSPE most often strikes children between the ages of four and twenty. The onset of the disease is marked by insidious mental deterioration and psychological disturbances. Neurological and motor dysfunctions such as convulsions, seizures, visual difficulties, and myoclon-

ic jerks are often seen. In its final stages, SSPE causes increased mental and physical decline which often leaves the patient incapacitated. Death usually occurs within one to three years. *See, e.g., The Merck Manual,* 2041 (Merck Sharp & Dohme Research Laboratories, 15th ed. 1987); *Harrison's Principals of Internal Medicine,* 2096 (R. Petersdorf, 10th ed. 1983).

**5.** Merck makes no claim that Congress expressly preempted state tort law.

regulations govern nearly every aspect of vaccine testing, design, production, labeling, and distribution. For example, each vaccine manufacturer must file with the FDA a detailed application for a license to begin testing a new vaccine, inform the FDA of production and distribution plans, and if approved, complete periodic updates containing a broad spectrum of information. 21 C.F.R. § 600 *et seq.* Similarly, the vaccine label and package circular must receive federal approval. 21 C.F.R. §§ 1, 201. The FDA requires extensive information to be included on the label and package circular, such as the composition of the vaccine, the expiration date, the storage directions, the indications and contraindications of vaccine usage, and the potential adverse reactions. 21 C.F.R. §§ 610.60–610.65. The language of the label and package circular is subject to FDA scrutiny and cannot be changed without FDA authorization. 21 C.F.R. § 601.12.

■ Preemption of state tort law, however, does not automatically follow extensive federal regulation. *Hillsborough,* 471 U.S. at 715, 105 S.Ct. at 2376. Vaccine regulation, like the regulation of other prescription products, is primarily, but not exclusively, a federal concern. State regulation of these products plays an important and legitimate role and should not be displaced unless exceptional circumstances warrant it. In other words, in the absence of express preemption, there is a strong presumption that Congress did not intend to displace state law. *Maryland v. Louisiana,* 451 U.S. 725, 726, 101 S.Ct. 2114, 2118, 68 L.Ed.2d 576 (1981).[6] Moreover,

this presumption against preemption is even stronger when state regulation of matters related to health and safety is involved, *Hillsborough,* 471 U.S. at 715, 105 S.Ct. at 2376, and when federal regulation would work to preempt state tort remedies, *Silkwood v. Kerr–McGee Corp.,* 464 U.S. 238, 251, 104 S.Ct. 615, 623, 78 L.Ed.2d 443 (1984). Here, if federal regulation of vaccines is exclusive, Pennsylvania's ability to best protect its citizens from the dangers of vaccine use is severely hampered and it leaves those Pennsylvania citizens harmed by vaccines without a state tort remedy. Hence, I agree with the great majority of courts addressing this issue that Congress did not impliedly preempt state regulation of vaccine manufacture, distribution, and labeling.[7]

Merck's preemption argument is further diluted by the National Childhood Vaccines Injury Act of 1986 ("NCVIA"), 42 U.S.C. §§ 300aa–33. The NCVIA clearly shows that Congress intended state tort remedies to remain in effect despite extensive federal regulations. The NCVIA was enacted to provide an alternative to the courts for the redress of vaccine-related injuries. The NCVIA established a fund from which individuals injured by vaccines may receive compensation if certain statutory requirements are met. The NCVIA does not eliminate, however, the state tort system as an avenue of redress. It has numerous references to the state tort system and expressly provides that "[s]tate law shall apply to a civil action brought for damages for a vaccine-related injury or death." 42 U.S.C. § 300aa–22(a). Similarly, it provides that:

---

**6.** In *Hillsborough,* the Court explained that:

because agencies normally address problems in a detailed manner and can speak through a variety of means ... we can expect that they will make their intentions clear if they intend for their regulations to be exclusive. Thus, if an agency does not speak to the question of pre-emption, we will pause before saying that the mere volume and complexity of its regulations indicate that the agency did in fact intend to preempt.

471 U.S. at 715, 105 S.Ct. at 2376.

**7.** *See, e.g., Hurley v. Lederle Laboratories Division of American Cyanamid Co.,* 863 F.2d 1173 (5th Cir.1988), *rev'g Hurley v. Lederle Laborato-*

*ries,* 651 F.Supp. 993 (E.D.Tex.1986); *Abbot v. American Cyanamid Co.,* 844 F.2d 1108 (4th Cir.), *cert. denied* 488 U.S. 908, 109 S.Ct. 260, 102 L.Ed.2d 248 (1988), *rev'g* 1988 U.S.Dist.Lexis 14355 (E.D.Va.1987); *Jones by Jones v. Lederle Laboratories,* 695 F.Supp. 700 (E.D.N.Y.1988); *Foyle by McMillan v. Lederle Laboratories,* 674 F.Supp. 530 (E.D.N.C.1987); *Martinkovic v. Wyeth Laboratories, Inc.,* 669 F.Supp. 212 (N.D. Ill.1987); *Morris v. Parke, Davis & Co.,* 667 F.Supp. 1332 (C.D.Cal.1987); *MacGillvray v. Lederle Laboratories,* 667 F.Supp. 743 (D.N.M. 1987); *Graham v. Wyeth Laboratories,* 666 F.Supp. 1483 (D.Kan.1987); *Patten v. Lederle Laboratories,* 655 F.Supp. 745 (D.Utah 1987).

[n]o state may establish or enforce a law which prohibits an individual from bringing a civil action against a vaccine manufacturer for damages for a vaccine-related injury or death....

*Id.* at § 300aa–22(e). These sections certainly manifest Congress' intent to preserve traditional state tort remedies for redress of injuries related to vaccine use.

Merck argues alternatively that even if federal regulations do not preempt state regulation of vaccine labeling generally, I should find that Congress intended to preempt the more narrow field of "state regulation of the information to be provided to the medical community regarding the ... association between the administration of measles vaccine and SSPE." Merck's mem. in sppt. at 52. Merck suggests that preemption is intended because during the mid–1970's the CDC studied the relationship, if any, between measles vaccines and SSPE. The results of the study, published in *Morbidity and Mortality Weekly Report,* 359–60 and 365 (November 19, 1976), were then sent to Merck by the FDA with the "suggest[ion] that you review your package circular ... and revise ... [it] ... appropriately to reflect these modifications of earlier recommendations." Mazurs' exhibit 54.

■ I have no doubt that because of this prodding by the FDA, Merck's package circular reads as it does; however, mere compliance with an FDA suggestion, or for that matter, regulation or order, does not mean that state tort law becomes irrelevant. First, compliance with an FDA regulation may establish that the manufacturer met the appropriate minimum standards of due care, but compliance does not necessarily absolve the manufacturer of all liability. *See, e.g., Brochu v. Ortho Pharmaceutical Corp.,* 642 F.2d 652, 658 (1st Cir.1981). Manufacturers must meet state safety requirements, whether codified or embodied in the common law, in addition to satisfying the initial FDA requirements.

Second, federal regulation serves a very different purpose than state tort law. Essentially, federal regulation serves a deterrent purpose by limiting the manufacture of inherently dangerous products to those applicants who meet certain stringent safety standards, while state tort law serves the equally important purpose of compensating individuals injured by those very same products. Since compliance with FDA regulations will not ensure that a manufacturer's products will not cause injury, compliance will not necessarily exempt a manufacturer from liability. When those products do cause injuries, the state tort system provides a means of compensation. State tort law is intended to supplement federal regulation by providing a vehicle for compensation of vaccine-related injuries.[8]

■ Merck also contends that federal regulation of vaccine labels and package circulars would be undermined if state law required that they contain different information than that already approved by the FDA. Merck cites *Cippolone v. Liggett,* 789 F.2d 181 (3d Cir.1986), *cert. denied,* 479 U.S. 1043, 107 S.Ct. 907, 93 L.Ed.2d 857 (1987), for its two-pronged analysis of when state law so conflicts with federal law as to require that state law yield.[9] The analysis begins with a determination of the purposes of federal law. The court should next determine whether a state law would

---

**8.** The Commissioner of Food and Drugs at the FDA disavowed any intention to preempt state tort law with its labeling rules. "It is not the intent of FDA to influence the civil tort liability of the manufacturer or of the physician. Rather, it is the agency's intent to ensure that a complete and accurate explanation of the drug is provided to the medical community." *Bansemer v. Smith Laboratories, Inc.,* 1988 U.S. Dist. Lexis 16208, 16215 (E.D.Wis. September 12, 1988) (quoting 44 Fed.Reg. 37,437 (1979)). *See also* 43 Fed.Reg. 4214 (January 31, 1978).

**9.** *Cippolone* is a good example of when preemption is intended. In *Cippolone,* the Third Circuit focused on the Federal Cigarette Labeling and Advertising Act, 15 U.S.C. § 1331 *et seq.* That Act prescribed the exact wording of the label to be placed on cigarette packages and included a preemption provision which precluded state legislatures from requiring warnings on cigarette packages which differed from those mandated by the Act. There is no such provisions in the FDCA or PHSA. *See In re Tetracycline Cases,* 1989 U.S. Dist. Lexis 4130, 4143–45 (W.D.Mo. March 29, 1989).

frustrate the purposes of federal law. *Id.* at 187. Using this analysis, I once again hold that no finding of preemption is warranted.

I accept, for the sake of argument, Merck's contention that the purpose behind FDA regulation of labeling is uniformity.[10] But if a state jury determines that Merck should have disclosed more information regarding the causal link between SSPE and MMR II, if in fact there is one, *see infra* at 263, Merck can petition the FDA to allow it to change its package insert. 21 C.F.R. § 601.12. Thus, Merck could meet both federal and state law requirements. Moreover, it makes sense from a policy standpoint to permit civil judgments to supplement federal regulations. As the Court of Appeals for the District of Columbia noted in the related area of herbicide regulation by the Environmental Protection Agency ("EPA"):

> successful actions of this sort may lead manufacturers to petition EPA to allow more detailed labelling of their products; alternatively, EPA itself may decide that revised labels are required in light of new information that has been brought to its attention through common law suits. In addition, the specter of damage actions may provide manufacturers with added dynamic incentives to continue to keep abreast of all possible injuries stemming from use of their product so as to forestall such actions through product improvement.

*Ferebee v. Chevron Chemical Co.,* 736 F.2d 1529, 1542–43 (D.C.Cir.), *cert. denied* 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984).[11] Rather than working at odds with each other, federal regulation and state

common law acting in concert can improve vaccine safety of existing vaccines and spur the development of improved vaccines.

Accordingly, I find Pennsylvania tort law is not preempted by federal regulation of vaccine manufacture, distribution, and labeling, in general, and with respect to SSPE information in the package circular, in particular. Therefore, Merck's motion for partial summary judgment on this ground will be denied.

### III. STATUTE OF LIMITATIONS

Lisa Mazur received the MMR II vaccination on February 26, 1982. The Mazurs filed this action on October 31, 1985. Merck contends that the tort claims of Lisa's parents are barred under Pennsylvania's two year statute of limitations.[12] 42 Pa.C.S.A. § 5524(2) and (7). Ordinarily, the two year statute would be a bar to this action; however, Mr. and Mrs. Mazur may be entitled to invoke the "discovery rule" in order to extend the period of limitations. *Urland v. Merrell–Dow Pharmaceuticals,* 822 F.2d 1268 (3d Cir.1987).

Where an injured person is unable, "despite the exercise of diligence, to determine the injury or its cause," the discovery rule tolls the running of the statute of limitations. *Pocono International Raceway, Inc. v. Pocono Produce, Inc.,* 503 Pa. 80, 84, 468 A.2d 468, 471 (1983). The rule provides that the limitations period begins to run when the plaintiff knows or should know: (1) that he has been injured, and (2) the injury has been caused by another party's conduct. *Cathcart v. Keene Industrial Insulation,* 324 Pa.Super. 123, 135–37, 471 A.2d 493, 500 (1984).

---

**10.** I disagree with this contention, but I see no reason to belabor the issue. I suggest that a concern for the safety of consumers plays a more vital role.

**11.** In the *Tetracycline Cases,* the court raised a similar point. The court posited that the common law duty to warn carried with it a duty to seek FDA approval of additional warnings. *In re Tetracycline Cases,* 1989 U.S. Dist. Lexis at 1448. The court further opined that "[t]o find otherwise would allow a manufacturer, having learned of additional side effects or precautions, to escape liability for injuries resultant there-

from by remaining silent and relying on lack of prior FDA approval." *Id.; see also MacGillvray v. Lederle Laboratories,* 667 F.Supp. 743, 745 (D.N.M.1987) ("Public policy militates against finding as a matter of law that FDA approval of a particular drug product relieves a pharmaceutical company of further responsibility to continue research and testing to develop safer products.").

**12.** The running of the statute of limitations as to Lisa's tort claims is tolled during her minority. 42 Pa.C.S.A. § 5533(b) (1984).

The proverbial clock starts to tick when the injured party "possesses sufficient critical facts to put him on notice that a wrong has been committed and that he need investigate to determine whether he is entitled to redress." *Zeleznik v. United States*, 770 F.2d 20, 23 (3d Cir.1985), *cert. denied*, 475 U.S. 1108, 106 S.Ct. 1513, 89 L.Ed.2d 913 (1986). With respect to this case, the salient issues are (1) when did Mr. and Mrs. Mazur know, or when should they have known, that Lisa had SSPE; and, (2) when did they know, or when should they have known, that MMR II was the cause of the disease.[13] As to both questions, on the record before me, I conclude that genuine issues of material fact require resolution at trial.

The parties' submissions create an issue of fact as to when Lisa's parents knew of the SSPE diagnosis. On the one hand, in late September, 1983, Lisa's doctors, after reviewing the results of a broad range of diagnostic tests, discharged her from St. Christopher's with a diagnosis of "presumptive subacute sclerosing panencephalitis." Mazurs' exhibit 15. The consultation reports filled out by the numerous doctors who examined Lisa in September all include SSPE as a possible, if not probable, cause of Lisa's illness. *Id.* Additionally, Mrs. Mazur acknowledges in deposition that a Dr. Foley at St. Christopher's told her at some unspecified time that Lisa had SSPE. Merck's exhibit D at 141. Each of these facts tends to show that the Mazurs knew or should have known that Lisa had SSPE before October 31, 1983. On the other hand, the discharge summary and many of the consultant's reports include other possibilities for Lisa's illness, such as "Leigh's encephalopathy or seizure disorder." Mazur's exhibit 15. In his deposition, Lisa's treating physician, Dr. Warren Grover, stated that the term "presumptive" implied that the diagnosis was not final. Mazurs' exhibit 52 at 14. At the Mazurs' request, a second doctor, Samuel H. Tucker, M.D., confirmed the "presumptive" SSPE diagnosis in a letter dictated on October 28, 1983, and dated November 2, 1983. Mazurs' exhibit 17. It is unclear when the Mazurs were informed of this confirmatory opinion. The discharge summary, dated December 21, 1983, of Lisa's November visit to St. Christopher's includes the first unqualified diagnosis of SSPE. Mazurs' exhibit 18. When all the facts are examined, it seems that until then, at best, Lisa's doctors believed that in all likelihood she had SSPE but they could not make a definite statement to that effect.

The Mazurs contend that they cannot be held to a higher standard of knowledge than Lisa's doctors. They argue that if the medical personnel who saw Lisa could not come to a definitive conclusion about her illness until November, 1983, it would be unfair to presume that the Mazurs, who are not experienced in the medical field, knew or should have known that she had SSPE before October 31, 1983. This argument finds support in the Pennsylvania case of *Trieschock v. Owens Corning Fiberglas Company*, 354 Pa.Super. 263, 511 A.2d 863 (1986), *alloc. denied*, 514 Pa. 617, 521 A.2d 932 (1987). In that case, as part of a routine medical check-up conducted by his employer in March, 1982, Trieschock was told by the company doctor that he was suspected of having asbestosis. On April 8, 1982, that diagnosis was confirmed by an independent specialist. Trieschock filed suit on April 6, 1984. The court opined that:

> [a] plaintiff in a creeping disease case should not be required to have greater knowledge than his physicians about his medical condition. If those physicians are not reasonably certain as to his diagnosis, then he certainly cannot be bound to have the knowledge necessary to start the statute of limitations running.

354 Pa.Super. at 268, 511 A.2d at 866. Here, it is possible that Lisa's doctors could not identify her illness with a reasonable degree of certainty until early November, 1983. It may be that upon further examination of the facts at trial, a jury could conclude that the Mazurs knew in September or October, 1983, that Lisa had SSPE.

---

**13.** Of course, the issue of whether the MMR II vaccine caused the disease has not been resolved. *See infra* at 263. I am merely assuming causation for this limited purpose.

A reasonable jury could also find that the "presumptive" diagnosis of SSPE triggered a duty of diligent investigation as to the cause of Lisa's illness which went unfulfilled, thereby preventing the application of the discovery rule to toll the running of the limitations period. However, the request that Dr. Tucker examine Lisa to confirm or refute the SSPE diagnosis might satisfy the requirement of diligent investigation. Additionally, on the scant record before me it is unfair to conclude that the Mazurs knew or should have known the nature of Lisa's ailment before it was ascertained with a reasonable degree of certainty by the medical profession.

Even assuming *arguendo* that Lisa's parents knew that she had SSPE before October 31, 1983, Merck's motion for partial summary judgment on the basis that the statute of limitations ran still must be rejected. There is a genuine issue of material fact as to whether Mr. and Mrs. Mazur knew or should have known that Lisa's SSPE was caused by the MMR II inoculation. As I will discuss in greater detail below, *see infra* at 263, the causation question is unresolved. Even the so-called experts cannot agree on the cause of Lisa's illness after six and a half years of investigation. Once again, I will not hold Mr. and Mrs. Mazur accountable to a greater standard of understanding of their daughter's illness than her doctors.

Nonetheless, the contention that the Mazurs knew of the relationship between SSPE and measles, and quite possibly, the MMR II vaccine, is not without merit. On September 29, 1983, three days after Lisa was first discharged from St. Christopher's, Nancy Wasser, Esquire, then associated with the law firm of Sprague and Rubenstone, now Sprague, Higgins, Creamer & Sprague, the Mazurs' present counsel, contacted the nurse, Jeanette W. Fairorth, at the school where Lisa was enrolled.[14] Affidavit of Jeanette W. Fai-

rorth, ¶ 4, attached as Merck's exhibit Y. ("Fairorth aff."). On that day, Ms. Fairorth entered the following information on Lisa's health records:

T–C from Nancy Wasser "Attorney Spragues' [sic] office. Wanted info re measles shot date. Apparently Lisa is ill. Conf [with] vice principal Ms. Castleberry. Lisa's sister will come in for copy of immunization card. Med record from Creighton not in pocket.

Fairorth aff. at ¶ 4 and exhibit A. This exchange certainly shows that someone in the Mazur family thought there might be a relationship between Lisa's SSPE and her measles shot. Whether this conversation shows that for statute of limitations purposes the Mazurs knew or should have known of the causal link between SSPE and MMR II is an issue that must be left for a jury to decide. It very well may be that upon an examination of the circumstances surrounding this phone call that a reasonable jury could conclude that Mr. and Mrs. Mazur did, in fact, know of the causal relationship between Lisa's SSPE and the MMR II inoculation. Then again, a reasonable jury could also conclude that the phone call was merely part of the family's comprehensive efforts to gather information relating to Lisa's medical history. Because there are genuine issues of material fact relating to Merck's contention that the Mazur parents' tort claims are barred by the statute of limitations, I will deny Merck's motion for partial summary judgment on that ground.

## IV. DUTY TO WARN

### A. The Parties' Contentions

The Mazurs charge Merck with failing to warn them of the risks associated with the MMR II vaccine before Lisa was inoculated. They allege that they never received any warning from either Merck or the

**14.** Ms. Wasser avers that she was not retained as counsel by the Mazurs and only contacted the school nurse as a friend of the family. Affidavit of Nancy Wasser, ¶ 5, attached as Mazur's exhibit 53. Lisa's older sister, Deborah, was employed by Sprague & Rubenstone as a legal

secretary. *Id.* at ¶ 3. However, Ms. Wasser apparently identified herself to Ms. Fairorth as an attorney in Sprague's office rather than as a family friend. Fairorth Aff. at ¶ 4 and exhibit A.

school before Lisa was vaccinated.[15] The Mazurs assert claims of strict liability and negligence for failure to warn. The Mazurs' duty to warn claims depend on proof of four facts: (1) Merck had a duty to warn Lisa or her parents of the health hazards associated with MMR II use; (2) Merck breached that duty; (3) Merck's breach proximately caused Lisa's injuries; and (4) Merck's breach actually caused Lisa's injuries.

In its defense, Merck argues that it did not have a duty to warn the Mazurs, but it needed to warn only Dr. Sharrar, who decided that the MMR II vaccine would be used, or some other "learned intermediary." *See Reyes v. Wyeth Laboratories*, 498 F.2d 1264, 1276 (5th Cir.), *cert. denied*, 419 U.S. 1096, 95 S.Ct. 687, 42 L.Ed.2d 688 (1974). It also maintains that the warning it provided to Dr. Sharrar was adequate as a matter of law, so it could not have breached the duty to warn. In the alternative, Merck contends that even if it had a duty to warn the Mazurs directly, that duty was adequately fulfilled by the CDC when it issued the Important Information Statement to parents of potential vaccine recipients. As for proximate causation, Merck posits that Dr. Sharrar's reliance on a CDC recommendation and on his own research absolves Merck of causal liability. Finally,

Merck argues that under no circumstances can the Mazurs prove that MMR II caused Lisa to contract SSPE. After considering the parties' lengthy briefs on these issues, I find that Merck's motion for partial summary judgment on the duty to warn claims must be denied.

**B. The Manufacturer's Duty to Warn**

■ Ordinarily, Pennsylvania follows Section 402A of the Restatement (Second) of Torts which imposes strict liability on the manufacturer of a product sold "in a defective condition unreasonably dangerous to the user or consumer...." *Incollingo v. Ewing*, 444 Pa. 263, 287, 282 A.2d 206, 219 (1971). The product may be considered in a defective condition if it is sold without a warning of the hazards associated with its use. *Incollingo*, 282 A.2d at 219. The strict liability rules for prescription drug products, such as vaccines, are somewhat different under Pennsylvania law. In *Incollingo*, the court found that there are some products "which ... [are] ... incapable of being made safe for ... [their] intended use, such as new or experimental drugs, as to which ... there can be no assurance of safety, but ... the marketing and use of the drug notwithstanding a medically recognizable risk" is justified.[16]

---

**15.** Mrs. Mazur states in her deposition that Lisa did, in fact, bring home two documents, but not the Important Information Statement, that informed her of the scheduled immunization program at the Morrison School. Merck's exhibit D at 104–05, and Mazurs' exhibit 2 at 106–108. Mrs. Mazur admits that she read the letter and permission form but refused to sign it or return it to the school unsigned. *Id.* at 109. Whatever Mrs. Mazur saw, it was apparently enough of a warning to cause her to protest Lisa's pending vaccination to the principal and the Board of Education and to keep Lisa out of school for a week as a precaution. *Id.* at 117.

**16.** In *Incollingo*, the court held that Chloromycetin, a broad spectrum antibiotic, fell within this category of "unavoidably unsafe products." *Id.* (quoting, Section 402A, comment k Restatement (Second) of Torts). MMR II, assuming that it was properly prepared and accompanied by a proper warning, is also within this category of unavoidably unsafe products. This is evidenced by comment k of Section 402A, which provides in pertinent part:

Unavoidably unsafe products. There are some products which, in the present state of

human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. An outstanding example is the vaccine for the Pasteur treatment of rabies, which not uncommonly leads to very serious and damaging consequences when it is injected. Since the disease itself invariably leads to a dreadful death, both the marketing and the use of the vaccine are fully justified, notwithstanding the unavoidable high degree of risk which they involve. Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it unreasonably dangerous. The same is true of many other drugs, vaccines, and the like, many of which for this very reason cannot legally be sold except to physicians, or under the prescription of a physician.... The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently

*Id.* With respect to those special products, the ordinary, strict liability principles of section 402A do not apply. *Id.* Rather, "the standard of care required is that set forth in § 388 of the Restatement dealing with the liability of a supplier of a chattel known to be dangerous for its intended use. Under this section, the supplier has a *duty to exercise reasonable care* to inform those for whose use the article is supplied of the facts which make it likely to be dangerous."[17] *Id.* 282 A.2d at 219 n. 9 (emphasis added); *see also Baldino v. Castagna*, 505 Pa. 239, 244, 478 A.2d 807, 810 (1984). If the manufacturer can show that he has met this standard of care, he cannot be held strictly liable for the injuries which his product causes. With respect to this case, where the Mazurs do not identify any design or manufacturing defect, the focus must be on whether MMR II was distributed with a proper warning. Since the Mazurs assert that Merck is both strictly liable and liable for its negligence in failing to warn them of the dangers of MMR II inoculation, a liability analysis under either theory will depend on whether Merck complied with the "duty to exercise reasonable care to inform" the Mazurs of health risks associated with MMR II use.[18]

■ In Pennsylvania, as in most other states, the manufacturer of prescription drugs or vaccines, must meet its informational obligation, in most instances, by providing an adequate warning to a "learned intermediary," *Reyes v. Wyeth Laboratories*, 498 F.2d 1264, 1276 (5th Cir.), *cert. denied*, 419 U.S. 1096, 95 S.Ct. 687, 42 L.Ed.2d 688 (1974), rather than to the general public or individual consumer. *Incollingo*, 282 A.2d at 220 (learned intermedi-

ary is the prescribing physician); *see also Walker v. Merck & Co., Inc.*, 648 F.Supp. 931 (M.D.Ga.1986), *aff'd without op.*, 831 F.2d 1069 (11th Cir.1987) (school nurse qualifies as a learned intermediary). The so-called "learned intermediary rule" embodies the practical realities surrounding the dispensation of prescription drugs. In such instances, the choice of which, if any, prescription product to use is:

> essentially a medical one involving an assessment of medical risks in the light of the physician's knowledge of his patient's needs and susceptibilities. Further it is difficult under such circumstances for the manufacturer, by label or direct communication, to reach the consumer with a warning. A warning to the medical profession is in such cases the only effective means by which a warning could help the patient.

*Davis v. Wyeth Laboratories*, 399 F.2d 121, 130 (9th Cir.1968). *See also Hoffman v. Sterling Drug, Inc.*, 485 F.2d 132 (3rd Cir.1973) (Third Circuit adopts the reasoning of *Incollingo* and *Davis* to hold that manufacturer of prescription drug need only warn either the prescribing or treating physician.). Since *Davis*, the focus has been on the extent of the medical professional's involvement in the decision to administer the drug. The learned intermediary rule has been found to apply in situations where the medical professional exercises his "individual medical judgment bottomed on a knowledge of both patient and palliative." *Reyes*, 498 F.2d at 1276.

In most but not all of the vaccine cases, the learned intermediary rule has been applied, since a physician or a physician's aide, such as a nurse, administered the

---

useful and desirable product, attended with a known but apparently reasonable risk.

**17.** Section 388 of the Restatement (Second) of Torts provides in pertinent part:

One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

(a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and
(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

**18.** Section 388 is ordinarily applicable to negligence cases, as well as to strict liability cases involving prescription drug products. *Incollingo*, 282 A.2d at 219, n. 9.

vaccine.[19] However, in *Davis*, the Ninth Circuit opined that in situations where the vaccine is not dispensed as a prescription drug and is "dispensed to all comers at mass immunization clinics without an individualized balancing by a physician of the risks involved.... It is the responsibility of the manufacturer to see that warnings reach the consumer, either by giving warning itself or by obligating the purchaser to give warning." 399 F.2d at 131. All of the vaccine cases recognize the theoretical validity of the "mass immunization exception" to the learned intermediary rule, but very few have found situations where its application is warranted. *See Petty v. United States*, 740 F.2d 1428 (8th Cir.1984) (swine flu vaccine administered in a county health clinic as part of the National Swine Flu Immunization Program); *Givens v. Lederle Laboratories*, 556 F.2d 1341 (5th Cir.1977) (polio vaccine administered by private physician who testified that the "administration [of the vaccine] in his office 'really doesn't differ' from that of the Public Health Center; 'not in the administration at all.' "); *Davis* (polio vaccine administered by public health official, a pharmacist, in a community clinic as part of a nationwide immunization program recommended by the Surgeon General of the United States); *Reyes* (polio vaccine administered by public health official, a registered nurse, in a community clinic as part of a nationwide immunization program recommended by the Surgeon General of the United States).

The initial step in determining if Merck must face liability for Mrs. Mazur's claim that she never received a warning is to decide whether the learned intermediary rule or the mass immunization exception applies. If the learned intermediary rule applies, Merck only need have warned adequately the learned intermediary and the failure to warn Mrs. Mazur is irrelevant.

If the mass immunization exception applies, then Merck must have exercised reasonable care to see that the Mazurs, as opposed to a learned intermediary, were adequately warned. Merck chose to rely on the CDC to meet this obligation or to ensure that the learned intermediary rule would apply. It must be determined if Merck acted in accordance with its duty to exercise reasonable care to inform the Mazurs of the health risks of MMR II use when it so contracted with the CDC. This determination will depend on whether Merck foresaw or should have foreseen that its reliance on the CDC was reasonable.

### 1. The Learned Intermediary Issues

▇ Merck contends that Dr. Sharrar, in his position as director of the Health Department, acted as the learned intermediary, so when Merck and the CDC provided warnings to him, it fulfilled its duty to warn the medical professional of the risks of MMR II immunization. This contention is without merit. Dr. Sharrar, in fact, did not perform the necessary individualized balancing required of a learned intermediary. There is no dispute that Dr. Sharrar considered the package circular, the recommendation of the CDC advisory committee, and the results of his own research before he selected the MMR II vaccine. Moreover, there is no dispute that Dr. Sharrar directed school nurses to review the medical records of nearly 300,000 students in the district and that 200,000 children did not receive the vaccines for a variety of reasons. It is also undisputed, however, that *he* did not review Lisa Mazur's medical records, consider her particular susceptibilities in light of the risks of MMR II inoculation, and was not even present at the time she was immunized. Merck does not even suggest that he had ever even seen Lisa Mazur, let alone examined her, before Feb-

**19.** *See, e.g., Hurley v. Lederle Laboratories*, 863 F.2d 1173 (5th Cir.1989); *Plummer v. Lederle Laboratories*, 819 F.2d 349 (2nd Cir.), *cert. denied*, 484 U.S. 898, 108 S.Ct. 232, 98 L.Ed.2d 191 (1987); *Stanback v. Parke, Davis and Co.*, 657 F.2d 642 (4th Cir.1981); *Rohrbough v. Wyeth Laboratories, Inc.*, 719 F.Supp. 470 (N.D.W.Va. 1989); *Percival v. American Cyanamid Co.*, 689 F.Supp. 1060 (W.D.Ok.1987); *Foyle by McMillan v. Lederle Laboratories*, 674 F.Supp. 530 (E.D.N.C.1987); *Walker v. Merck & Co., Inc.*, 648 F.Supp. 931 (M.D.Ga.1986), *aff'd without op.*, 831 F.2d 1069 (11th Cir.1987); *Williams v. Lederle Laboratories*, 591 F.Supp. 381 (S.D.Oh. 1984).

ruary 26, 1982. Dr. Sharrar never acted as Lisa Mazur's physician. In short, Dr. Sharrar's function can be best described as purchasing agent for the Health Department. He determined what was best for the "average" student in the district and purchased enough MMR II to meet the needs of 300,000 "average" students. He did not make an individualized medical judgment about what was best for Lisa Mazur. Dr. Sharrar did not act as a learned intermediary between Merck and Lisa.

■ This conclusion does not lay to rest the learned intermediary issue. Although Merck does not argue the point directly, I find that there is a genuine issue of material fact as to whether Ms. Edith B. Frederick, the school nurse, acted as a learned intermediary when she permitted Lisa to receive the MMR II vaccine.[20] Ms. Frederick personally reviewed the medical records of every student, including Lisa Mazur's records, at the Morrison School and determined what immunization, if any, was needed. Mazurs' exhibit 11 at 19. She sent out with each child an Important Information Statement and the School District letter with the attached immunization record and the parental permission form, and upon return of the forms made a second determination of which vaccine was necessary. Merck's exhibit R at 45. She was present in the gym on the day Lisa received the MMR II inoculation. Ms. Frederick also states that one of her jobs was "to be kind of eyeballing the boys and girls to see whether they looked ill that day or if there was some reason they should not get the vaccine," and to ask if the children felt "all right." Id. at 49. Unfortunately, this is all the information that the parties have submitted about Ms. Frederick. Missing are affirmations of fact, such as her familiarity with the package circular or CDC recommendations, her technical training, or her memory of Lisa's condition at the time the vaccine was administered. These areas may be developed in greater detail at the time of trial. If so, a jury could conclude that she performed the tra-

ditional functions of the learned intermediary and if Merck provided her with an adequate warning, it met its burden under Pennsylvania law.

The conclusion that under certain circumstances a nurse, as opposed to a physician, can act as a learned intermediary has won some approval, although there is no Pennsylvania case on point. In *Walker v. Merck & Co.; Inc.*, 648 F.Supp. 931 (M.D. Ga.1986), *aff'd without op.*, 831 F.2d 1069 (11th Cir.1987), a case involving the administration of the MMR II vaccine to a pregnant high school student as part of a county-wide high school immunization program, the court found that under Georgia law, the learned intermediary exception applied to nurses in general, and, in particular, to the nurse who administered the vaccine. *Accord Rohrbough v. Wyeth Laboratories*, 719 F.Supp. 470 (N.D.W.Va.1989). In *Walker*, the plaintiff "received the M–M–RII injection from a licensed practical nurse who was aware of the risks associated with M–M–RII, particularly the risks for pregnant females, and who stated that she had read and understood the circular accompanying the M–M–RII." *Walker*, 648 F.Supp. at 934. Here, upon further examination of the facts, it may be that Ms. Frederick had a similar knowledge of the risks of MMR II inoculation as described in the package circular and Lisa Mazur's particular "needs and susceptibilities," *Davis*, 399 F.2d at 130, and she was able to make an individualized, informed medical judgment about whether Lisa should receive the MMR II inoculation.

I recognize that an argument can be made that since a Pennsylvania appellate court, *Makripodis v. Merrell–Dow Pharmaceuticals, Inc.*, 361 Pa.Super. 589, 523 A.2d 374 (1987), and a Philadelphia Common Pleas court, *Coyle v. Richardson–Merrell, Inc.*, 15 Phila. 389,/1987 Phila.Cty. Rptr. Lexis 80 (Phila.Ct.Com.Pleas April 10, 1987), refused to extend the learned intermediary rule to retail pharmacists, and there is no Pennsylvania case that address-

---

**20.** On the other hand, there is no question that Daniel S. Wood, the technician who administered the MMR II inoculation to Lisa, was not a

learned intermediary. Simply put, he is not a medical professional and therefore cannot be a learned intermediary.

es whether a nurse can act as a learned intermediary, the learned intermediary designation should be limited to physicians. A distinction can be drawn between a nurse and a pharmacist, however. The former often performs tasks similar to a physician, while the latter is more of a technician or a retailer of previously prescribed drugs. The nurse is familiar with the patient's medical history and current condition, whereas the pharmacist is, in many instances, unfamiliar with his customer. The nurse, as well as the physician, is in a position to know the characteristics of the drug, the amount of the drug which can be safely administered, and most importantly, the individual characteristics of the patient. *Makripodis*, 523 A.2d at 378. The pharmacist only dispenses those drugs which the learned intermediary has already decided are necessary for the patient. The pharmacist often does not engage in any decision making of the kind ordinarily associated with that of doctors and nurses.

Moreover, this close association in function between doctor and nurse has been to some extent recognized by the Pennsylvania legislature in 42 Pa.C.S.A. § 8334(a). Section 8334(a) extends a limited grant of immunity from liability to *both physicians and nurses* for adverse reactions arising from the use of vaccines administered as part of a "mass immunization project." [21] This section certainly evidences a legislative view that physicians and nurses often engage in similar activities when administering vaccines on a large-scale basis. I predict that the Pennsylvania courts if presented with the question of whether a nurse can be a learned intermediary would recognize that doctors and nurses perform similar roles when vaccinating patients and would hold that in appropriate circumstances a nurse can act as a learned inter-

mediary. Therefore, the issue of whether Frederick falls within the learned intermediary definition must be resolved at trial, because if so and if Merck provided her with an adequate warning, Merck did not breach the duty to warn.

### 2. The Mass Immunization Exception

Assuming *arguendo* that Ms. Frederick is not found to be a learned intermediary, the Mazurs still must prove that the mass immunization exception applies to trigger Merck's duty to warn them directly. They cannot do so, however. In *Davis*, the Ninth Circuit opined that in situations where the vaccine is not dispensed as a prescription drug and is "dispensed to all comers at mass immunization clinics without an individualized balancing by a physician of the risks involved.... It is the responsibility of the manufacturer to see that warnings reach the consumer, either by giving warning itself *or* by obligating the purchaser to give warning." 399 F.2d at 131 (emphasis added). The "mass immunization exception" has not been applied often, because as the court in *Stanback v. Parke, Davis & Co.*, 657 F.2d 642, 647 (4th Cir.1981), stated, the exception "is quite narrow and highly fact specific." I have found only four such cases, three of which dealt with nationally sponsored immunization programs: *Petty v. United States*, 740 F.2d 1428 (8th Cir.1984); *Reyes; Davis;* and *Givens v. Lederle Laboratories*, 556 F.2d 1341, 1345 (5th Cir.1977).

The mass immunization exception to the learned intermediary rule recognizes that there may be circumstances when by reason of the very size of a program, a manufacturer will know or should know that its product will not be dispensed as a prescription drug; in short, the manufacturer can foresee that there will be no individualized

---

**21.** There is no indication that the School District immunization was a Pennsylvania Department of Health-approved "mass immunization project." Section 8334 provides in pertinent part:

> (a) General rule.—Any physician who does not receive remuneration for his services in a mass immunization project approved in writing by the [Pennsylvania] Department of Health ..., and any registered nurse, or prac-

tical nurse licensed to practice in this Commonwealth who shall participate in such project ... shall not be liable, except for gross negligence, to any person for illness, reaction, or adverse effect arising from or out of the use of any drug or vaccine in such project by such physician or such nurse.

> (b) Exception.—This section shall not exempt any drug manufacturer from any liability for any drug or vaccine used in such project.

balancing of the medical benefits and risks. As the court in *Reyes* stated:

[w]here there is no physician to make an 'individualized balancing ... of the risks', ... the very justification for the prescription drug exception [the learned intermediary rule] evaporates. Thus, as in the case of patent drugs sold over the counter without prescription, the manufacturer of a prescription drug who knows or has reason to know that it will not be dispensed as such a drug must provide the consumer with adequate information so that he can balance the risks and benefits of a given medication himself.

*Reyes*, 498 F.2d at 1276 (quoting *Davis*, 399 F.2d at 131). In *Reyes*, the court found that Wyeth "had ample reason to foresee the way in which its vaccine would be distributed," because "it was common knowledge in the drug industry that a great majority of vaccinees receive their Sabin [polio] vaccines in mass administrations or county clinics manned at least in part by volunteers ... [and] ... these clinics, as Wyeth must be presumed to know, dispense Sabin vaccine to all comers in an 'assembly line' fashion." *Id.* at 1277 (quoting *Davis*, at 131).

 Here, the Mazurs have not presented any facts which tend to show that Merck should have foreseen that the MMR II vaccine would have been dispensed in the Philadelphia school program without individual judgments as to each inoculation. In its contract with Merck, CDC represented and agreed that it would "take all appropriate steps to assure that all vaccine supplied to various locations within the 50 states, ... pursuant to the terms of this contract, shall be administered on the basis of an individualized medical judgment by a physician ..." Freilich aff. at ¶ 17 and exhibits 3, 4, and 5. In fact, individualized

judgments were made: two out of three students in the Philadelphia school population were eliminated from the inoculation program.

While Ms. Frederick was no physician, she was on hand when Lisa was immunized to make an individualized decision as to each child. Even if she was inadequately trained, inadequately instructed and ultimately made the wrong decision as to Lisa, she was the school district's response to the obligation imposed on the CDC by its purchase contract with Merck. There has been no suggestion as to any reason why Merck could have or should have foreseen that the MMR II would not be dispensed as a prescription drug.

This case is distinguished from *Reyes*, *Davis*, *Givens*, and *Petty* in that the size of the immunization program here is significantly smaller and does not by its sheer size create a situation where the absence of a learned intermediary is foreseeable. In all of those other cases, the inoculation was provided to the plaintiff as part of a nationwide immunization effort. For example, in *Petty*, the vaccine was provided to the plaintiff pursuant to the National Swine Flu Immunization Program, which as one might guess from its name, was a national inoculation drive. The recipient pool here was initially some 300,000 students in the Philadelphia school system. The Health Department program, like the program in *Walker*, was "instituted only to immunize certain ... students who needed the vaccine or who did not have their updated shot records." [22] *Walker*, 648 F.Supp. at 935. The Health Department program is simply not, for the lack of a suitable substitute term, "mass" enough to fall within the narrow, highly fact specific exception to the general rule.[23]

As the court in *Davis* described, the polio immunization programs were for "all-com-

---

22. I recognize that in all probability, the *Walker* immunization program was smaller than this one. I cannot imagine that Bibb County, Georgia, had nearly 100,000 high school students who received vaccines as was the case with the Health Department program. Nevertheless, the two programs are more similar to each other, than to the nationwide polio or swine flu immunization programs.

23. My decision here should not be interpreted that under no circumstances should the mass immunization exception apply to immunization programs of less than national proportion. The mass immunization exception, if it is to have any weight at all, must cover situations where the recipient pool is smaller than the whole nation. *Contra Stanback*, 657 F.2d at 647. What the size of that program should be, I will

ers." It does not seem that there were any provisions by which potential recipients could choose not to be immunized or by which potential recipients were rejected for some particular reason. It was as if the vaccines were dispensed as over the counter drugs with no means of limiting distribution to a particular individual. Here, the Health Department program allowed parents to exclude their children from the program for religious or medical reasons. *See* Mazurs' exhibit 10. Parents, if they could have proved prior immunizations or previous illnesses, could have prevented their children from being vaccinated. *Id.* As a last resort, parents also could have kept their children out of school for a period of time as a means of avoiding an unwanted immunization, as did Mrs. Mazur. Further, school nurses excluded students by virtue of their past immunization or illness records, *id*, or by making a judgment that certain students on the day of inoculation did not appear healthy enough to receive the vaccine. Merck's exhibit R at 49. Apparently, the screening process was highly effective because nearly two-thirds of the eligible students did not receive an MMR II inoculation. In this situation, it cannot be said that the MMR II inoculation was provided to "all-comers"; rather, it was dispensed on an individual basis as needed. Because there is no evidence to suggest that Merck foresaw that no learned intermediary would be present at inoculation, the Health Department program was not large enough to be considered a mass immunization program, and the vaccine was not dispensed to "all-comers," the mass immunization exception does not apply.

### 3. Adequacy of the Package Circular

In the event Ms. Frederick is found to be a learned intermediary, the Mazurs' chal-

lenge to the adequacy of the warnings contained in the MMR II package circular that should have been provided to Ms. Frederick becomes significant. They have submitted affidavits from two doctors in support of their allegations that the package circular did not reflect accurately the dangers associated with the MMR II vaccine. Specifically, the doctors aver that the package circular substantially increased the risk that Lisa Mazur would receive an unnecessary measles vaccine because it: (1) refers to doses distributed rather than doses actually used, thereby creating the perception that the incidence rates of SSPE and measles are lower than the actual rates for the two diseases;[24] (2) does not include stronger language warning intermediaries of the dangers when the MMR II vaccine is given to children medicated with Depo–Medrol, a corticosteroid; (3) fails to explain the dangers associated with revaccination; (4) states that MMR II is indicated for adult use based upon inadequate testing for adverse reactions by Merck; and (5) "demonstrates that Merck is aware of the possible causal relationship between measles vaccine and SSPE but has not properly involved itself in basic scientific research before it could say that a cause-and-effect relationship has not been determined; and thereby deemphasizes the risks involved in receiving a measles antigen in order to encourage physicians to immunize as many children as possible." Affidavits of J. Anthony Morris, Ph.D., and Kevin C. Geraghty, M.D., respectively, Mazurs' exhibits 50 and 25.

As an initial matter, it should be noted that by receiving FDA approval of its package circular, Merck has at least complied with a minimum standard of ade-

---

leave for others to decide. Here, I merely conclude that a program of 100,000 recipients is not within the ambit of the exception, because its size does not create a situation where the absence of a learned intermediary is foreseeable to the vaccine manufacturer.

**24.** The section of the April, 1981, MMR II package circular SSPE warning of which the doctors complain reads as follows:

Based on estimated nationwide measles vaccination distribution, the association of SSPE cases to measles vaccination is about one case per million vaccine doses distributed. This is far less than the association with natural measles, 5–10 cases of SSPE per million cases of measles.

quacy. *See Graham v. Wyeth Laboratories*, 666 F.Supp. 1483, 1499 (D.Kan.1987). Thus, it becomes incumbent upon the Mazurs to identify particular problems with the package circular. Of course, the Mazurs must also present factual support for their claims of inadequacy. Once this threshold burden is met, in ordinary circumstances, the adequacy of the warning is a question of fact for the jury, *Incollingo*, 444 Pa. at 288–89, 282 A.2d at 220; however, it is not improper for the court to determine that a warning is adequate as a matter of law. Here, I find that except for the revaccination complaint, which creates a genuine issue of material fact for trial, the Merck package circular is otherwise adequate as a matter of law.

 As it appeared in the April, 1981, MMR II package circular, the revaccination section provided:

> Revaccination: Based on available evidence, there is no reason to routinely revaccinate children originally vaccinated when 12 months of age or older; however, children vaccinated when younger than 12 months of age should be revaccinated. The decision to revaccinate should be based on evaluation of each individual case.

This statement provides no information about the potential risks associated with revaccination. The Mazurs have presented evidence that revaccination poses a health risk beyond that which is covered in the circular's general SSPE warnings. Geraghty aff., Mazurs' exhibit 50. The revaccination statement discusses only the need for revaccination from an immunization standpoint without mentioning that revaccination where it is not warranted could, indeed, be harmful. Additionally, Merck fails to distinguish the risk, if any, that may be present where a child who has been inoculated in the past with a measles vaccine, but not with one for mumps, subsequently receives the MMR II vaccine. This was the case with Lisa. She apparently received a measles and a German measles vaccine at the age of four, but never received a separate mumps vaccine. The Mazurs argue that the revaccination warning

is inadequate because it fails to direct physicians to forego inoculation with MMR II altogether where a child has previously received a measles vaccine, and it fails to recommend that children who have already received one or two of the three viruses contained in MMR II be inoculated with individual vaccines to complete the trio instead of with MMR II.

Merck does not address the revaccination issue in its briefs. I can only assume, therefore, that Merck concedes the existence of a genuine issue of material fact as to the adequacy of the revaccination warning in the package circular. The Mazurs have introduced evidence, unrefuted by Merck, from which a reasonable jury could conclude that Merck acted unreasonably by failing to specify that there are potential risks associated with inoculation with MMR II when a child has been inoculated previously with MMR II, or has been inoculated with some other form of either a measles, mumps, or rubella vaccine. Alternatively, a reasonable jury could find that the cautionary language at the end of the revaccination statement calling for "an evaluation of each individual case" is adequate to warn the medical profession about the risks, if any, of MMR II revaccination because sufficient information exists from other medical sources which refutes any relationship between revaccination and SSPE. *See* Recommendation of Immunization Practices Advisory Committee, *Morbidity and Mortality Weekly*, vol. 31, no. 17, 219–20, 221 (May 7, 1982) ("There is no evidence of enhanced risk from receiving the measles vaccine in persons who have previously received live measles vaccine or had measles. Specifically, there does not appear to be any enhanced risk of SSPE."). At best, the issues concerning the existence, if any, of a relationship between MMR II revaccination and an enhanced risk of SSPE and the adequacy of Merck's warnings in this regard in its package circular should be left for the jury to decide.

 Dr. Geraghty's accusation that Merck did not engage in sufficient research before it indicated MMR II for adult use is unavailing. I do not see the relevance of

this complaint to the facts of this case. On February 26, 1982, Lisa Mazur was only twelve years old. She was not an adult. I fail to understand how the inadequate testing of adults, even if the term is defined as post-pubescent individuals as Dr. Geraghty would have it, placed Lisa Mazur at risk. The Mazurs do not claim that Lisa was even beginning puberty at that time. Dr. Geraghty does not explain why the failure to test the MMR II vaccine on adults put Lisa at risk. Even if he is correct,[25] without an explanation of how that fact would affect Lisa, I cannot conclude that the Mazurs have raised a relevant and material issue of fact as to the adequacy of the MMR II package circular.

■■■■■ The Mazurs' remaining complaints about the package circular are also without merit. The first is correct in principle, but wrong in fact. The CDC report on which Merck relied when it drafted the SSPE and encephalitis warnings was based on the results of a study that took into account the discrepancy between doses used and doses distributed in calculating the risk percentages. *Morbidity and Mortality Weekly Report*, 359–60, 365 (November 19, 1976). As for the complaint that Depo–Medrol should be contraindicated in the package circular, I find that the warning that patients on corticosteroids should not be vaccinated is sufficient.[26] Merck cannot be expected to identify the combined effects of an MMR II vaccine and every single medication that a child might be taking or, in this case, was taking over a

month before the vaccine was administered. A reasonably prudent medical professional will understand that when the package circular contraindicates corticosteroids in general, Depo–Medrol, a specific corticosteroid, is also contraindicated.

■■■■ The Mazurs' claim that Merck did not engage in sufficient research before it could make the statement that a cause-and-effect relationship between SSPE and MMR II has not been determined is also fruitless. First, as can be seen below, Merck does not make a statement that there is no causal relationship between MMR II and SSPE. Rather, its package circular lays out the results of the CDC's comprehensive examination of the relationship of measles vaccines and SSPE.[27] Second, and most important, is that after over twenty years of study, Merck, as well as the independent researchers, have not been able either to establish or to discount a causal link between SSPE and measles vaccines. *See, e.g.,* Affidavit of Christopher M. Martin, M.D., ¶ 5, attached as Merck's exhibit I. Merck's and the CDC's research efforts on the causal connection between the MMR II vaccine and SSPE adequately support the statements in the package circular without deemphasizing the very real, but extremely small risk of contracting SSPE after inoculation with an MMR II vaccine.

### 4. Adequacy of the Important Information Statement

Because the Mazurs claim that they never received a direct warning of MMR II's

---

**25.** Current research seemingly disagrees with Dr. Geraghty. Merck referred me to a 1989 report by the CDC advisory committee in which the committee recommended that in outbreak situations junior and senior high school and college students be revaccinated. Merck's exhibit 4, attached to its reply.

**26.** The April, 1981, MMR II package circular contraindicates MMR II for use with "[p]atients receiving therapy with ... corticosteroids...."

**27.** The SSPE warning in the April, 1981, MMR II package circular is based on the findings of the CDC as reported in *Morbidity and Mortality Weekly Report*, 359–60 and 365 (November 19, 1976), and reads as follows:

There have been reports of subacute sclerosing panencephalitis (SSPE) in children who did not have a history of natural measles but

did receive measles vaccine. Some of these cases may have resulted from unrecognized measles in the first year of life or possibly from the measles vaccination. Based on estimated nationwide measles vaccination distribution, the association of SSPE cases to measles vaccination is about one case per million vaccine doses distributed. This is far less than the association with natural measles, 5–10 cases of SSPE per million cases of measles. The results of a retrospective case-controlled study conducted by the Center for Disease Control suggest that the overall effect of measles vaccine has been to protect against SSPE by preventing measles with its inherent risk of SSPE.

dangers, rather than that they received a warning but found·it inadequate in some particular way, *see, e.g., Leibowitz v. Ortho Pharmaceutical Corp.*, 224 Pa.Super. 418, 307 A.2d 449 (1973), the adequacy of the Important Information Statement, as opposed to the adequacy of the package circular, *see supra* at 257, is not an issue with which I need be concerned. However the Important Information Statement was worded it had no affect on Mrs. Mazur, I will only focus on the consequences, if there are any, of Mrs. Mazur's failure to receive it.

### 5. The Merck–CDC Purchase Contract

 The Merck–CDC purchase contract provides in pertinent part that the: [CDC], represents and agrees that it will (1) take all appropriate steps to assure that all vaccine supplied to various locations within the 50 states, ... pursuant to the terms of this contract, shall be administered to each patient on the basis of an individualized medical judgment by a physician, or (2) take all appropriate steps to provide to such a patient (or to the patient's parent or guardian) meaningful warnings relating to the risks and benefits of vaccination, in form and language understandable to such patient, parent or guardian.

Freilich aff. at ¶ 17 and exhibits 3, 4, and 5. In short, through this contract Merck attempted to guarantee that either a physician would be present at inoculation or an Important Information Statement would be sent to parents before inoculation. If the CDC performs its obligations, Merck fulfills its duty to warn under the learned intermediary rule, assuming an adequate package circular is made available to the learned intermediary, or under the mass immunization exception, because the recipient receives an adequate warning directly.[28] The more difficult question, which is in issue here, is what the legal consequences of the CDC's failure to live up to the demands of the contract are.

 As I have previously pointed out, the standard of care imposed upon a manufacturer of prescription drugs is that set forth in section 388 of the Restatement. *See infra* at 252. Comment n of section 388 deals with a manufacturer's duty to exercise reasonable care to inform those who will use a product of its dangers. The comment points out that there are certain factors that will aid in a determination of whether the manufacturer has acted reasonably or not including the nature of the product, the character of the person to whom it is supplied, and the way the product will be ultimately used. The care that must be taken always increases as risk of danger increases. Here the parties have not addressed whether Merck acted reasonably or not when it contracted with CDC to have MMR II administered only on the

---

**28.** I recognize that in Pennsylvania "the duty to provide a nondefective product is non-delegable," *Berkebile v. Brantly Helicopter Corp.*, 462 Pa. 83, 337 A.2d 893, 903 (1975) (per Chief Justice Jones, with one Judge concurring and five Judges concurring in the result), and a product sold with an inadequate warning may be considered defective. At first glance, it may seem that I am permitting Merck to delegate responsibility in a manner which contravenes *Berkebile*. However, this is not the case for two reasons. First, there is a difference between delegating responsibility to a third party and assigning a task to that third party. By obligating the CDC to provide either a learned intermediary or an Important Information Statement for the benefit of the vaccine recipient, Merck is merely assigning to the CDC the task of ensuring a particular method of distribution of its product. At all times, Merck is responsible for the CDC's *foreseeable* errors. This situation is not much different than that for any other prescription drug product. With regard to those products, the manufacturer designates them for distribution by prescription only. The manufacturer leaves it to the physician to properly prescribe the product for his patients. If the pharmacist dispenses the product without a prescription or if he dispenses it to someone who clearly should not receive it, he, not the manufacturer, *is liable for his misconduct*. Only if the manufacturer could foresee that the pharmacist would act in such a manner would the manufacturer be held responsible for any injuries that the product causes. Second, as I will discuss more fully above, section 388, the pertinent section when a prescription drug product is administered, permits, in certain circumstances, the manufacturer to escape liability by placing the obligation to warn the consumer on a third party. *See* comment n to section 388. Whether this is reasonable also depends to a great extent on foreseeability. *Id.*

basis of an individualized judgment made by a physician, or only after a meaningful warning had been given to the patient or the parent. If Merck acted reasonably, it may be absolved of liability despite the fact that Lisa's parents received no notice of MMR II's dangers. Ultimately, the reasonableness of Merck's conduct may be a jury question or may be susceptible to a disposition by summary judgment. In any event, I will give the parties additional time to bring to my attention anything that they believe is relevant with regard to Merck's reliance on the contract with CDC.[29]

The Mazurs argue that I should decide as a matter of law that the CDC did not perform its assigned tasks and Merck knew or should have known it would not do so. They assert, therefore, that Merck did not exercise reasonable care to inform them of the risks of MMR II inoculation and must be held liable for this failure to warn.

■ The Mazurs contend that the fact, assuming its truth, that Mrs. Mazur never received the Important Information Statement from the CDC shows that Merck did not act reasonably in relying on the CDC to provide a warning to her. They are wrong. The relevant issue is not whether Mrs. Mazur actually received the Important Information Statement, but whether Merck acted unreasonably because it did not foresee that she would not receive it. The Mazurs have not presented one single piece of evidence, other than Mrs. Mazur's claim that she never saw a CDC warning, that tends to prove that the CDC was not providing warnings to parents with any degree of frequency and that Merck knew of the

CDC's failure. Without something more than their self-serving allegation that they never received a warning, I will not invade the province of the jury and rule as a matter of law that Merck acted unreasonably in relying on the CDC and should be held accountable for the Mazurs' failure to receive a warning.

In summary, I extend the learned intermediary rule to cover situations where the nurse acts as a learned intermediary, but I leave for the jury the question of whether, in fact, Ms. Frederick performed the traditional duties of a learned intermediary on the day Lisa received her vaccine. I also leave for the jury the question of whether the package circular that should have been provided to Ms. Frederick adequately conveyed the risks associated with receiving a second dose of measles virus from the MMR II vaccine. Merck's contention that Dr. Sharrar acted as a learned intermediary is rejected. Further, I find the mass immunization exception should not apply to the 1981–82 Health Department immunization program. However, I conclude that on the state of the record before me today, Merck has not shown that it acted in accordance with due care, if it had a duty to warn the Mazurs directly rather than a duty to warn Ms. Frederick, when it contracted with the CDC to provide recipients of a MMR II vaccine with the benefit of a physician's presence at immunization or a detailed warning of the risks of inoculation.

C. Causation

1. *Proximate Causation*

■ Proof of proximate causation is one of two necessary causation elements,

---

**29.** The court in *Walker* found that as a matter of law Merck fulfilled its duty to warn when it entered into a contract identical to the one in issue here. *Walker,* 648 F.Supp. at 935. The *Walker* court relied on a proposition put forth by the court in *Reyes* and *Davis.* In those cases, the court held that a manufacturer of a vaccine could satisfy the duty to warn "by obligating the purchaser to give a warning." *Reyes,* 498 F.2d at 1276; *Davis,* 399 F.2d at 131. I disagree with this statement, because it ignores the important issue of whether the manufacturer was exercising reasonable care in accordance with section 388 when he obligated the purchaser to provide the consumer with a warning. *Baldino,* 505 Pa. at 244, 478 A.2d at 807 ("a manufacturer is

liable ... if he fails to exercise reasonable care to inform those for whose use the article is supplied of the facts which make it likely to be dangerous.") It may be that a vaccine manufacturer "by obligating the purchaser to give a warning" acted with reasonable care because there was no indication that the purchaser would not perform its assigned tasks. However, if obligating the purchaser to give a warning were unreasonable if, for example, it was readily apparent that the purchaser was unable to fulfill its obligation because it had no money to do so or the purchaser expressed an intention either orally or by past acts that it did not intend to perform its obligations, then the manufacturer cannot avoid liability by contract.

the other is cause-in-fact, in a tort case proceeding under theories of strict liability and negligence. *Sherk v. Daisy–Heddon,* 498 Pa. 594, 598, 450 A.2d 615, 617 (1982). A proximate cause is defined as a substantial contributing factor in bringing about the harm in question. *Van Buskirk v. Carey Canadian Mines, Ltd.,* 760 F.2d 481, 492 (3d Cir.1985). In short, the proximate causation determination is nothing more than the assignment of legal responsibility for a particular injury. In the duty to warn context, assuming that plaintiffs have established both duty and a failure to warn, plaintiffs must further establish proximate causation by showing that had defendant issued a proper warning to the learned intermediary, he would have altered his behavior and the injury would have been avoided.[30] *Van Buskirk,* 760 F.2d at 493. Defendant may "defeat causation in a failure to warn case by discrediting plaintiffs' claims that ... [the learned intermediary] ... would have acted to avoid injury, or by pointing to a third party as the sole proximate cause." *Id.* at 493. In this case, Merck does not raise a significant objection to the plaintiffs' assertion that Ms. Frederick would have heeded an adequate warning, if one had been provided. Instead, Merck argues that even if it failed to provide an adequate warning to Ms. Frederick, Dr. Sharrar's reliance on non-Merck sources of information about MMR II is the true proximate cause of Lisa's illness.

■ If Ms. Frederick is found to have acted as a learned intermediary, the important issue is whether she would have done anything different on February 26, 1982, after reading an adequate package circular. If she would not have changed her conduct and would have let Lisa receive the vaccine anyway, the causal chain is broken, and

Merck is absolved of liability. The record does not reveal, however, what, if anything, Frederick would have done if she had read an adequate warning. *Contra Plummer v. Lederle Laboratories,* 819 F.2d 349 (2d Cir.1987); *Stanback v. Parke, Davis and Company,* 657 F.2d 642 (4th Cir.1981) (defendant vaccine manufacturer is absolved of liability if plaintiff's treating physician testified in deposition that he was aware of the risk of illness associated with a flu vaccine, but nonetheless chose not to advise his patients about that risk before prescribing the vaccine.). It may be that Ms. Frederick would have heeded an adequate warning. I will permit the parties to supplement the record to flesh out whether a change in the revaccination warning would have caused Ms. Frederick to exclude Lisa from the immunization program.

Since it has not attempted, at this time, to discredit plaintiffs' assertion that an adequate warning would have been heeded by Ms. Frederick, Merck's asserted proximate cause defense depends on its claim that the legal responsibility for Lisa's illness should lie with Dr. Sharrar. It contends that it cannot be liable for Lisa's illness, because Dr. Sharrar relied not only on the package circular, but also on a CDC recommendation and his own independent research and medical judgment before he selected MMR II for the School District's immunization program. Sharrar aff. ¶¶ 7 and 9. *See Schrammel v. G.D. Searle & Co.,* 1988 WL 118850, 1988 U.S. Dist. Lexis 12465 (E.D.Pa. November 4, 1988), *aff'd without op.,* 875 F.2d 311 (3d Cir.1989) (Drug company is immune from liability if prescribing doctor had adequate information from other sources.) Merck maintains that the fact that Dr. Sharrar relied on these other sources breaks the proverbial causal chain and absolves it of any liability.[31]

---

**30.** As I noted above, *see supra* at 259, because the Mazurs claim that they never received a warning, rather than that they received an inadequate warning, the Important Information Statement will be considered as adequate. Therefore, the proximate cause question relates only to the alleged inadequacy in the package circular.

**31.** This is the only intervening cause argument that Merck offers; however, it may be that Dr.

Sharrar, the other School District employees, such as Ms. Frederick or Wood, or for that matter, Mrs. Mazur, negligently permitted Lisa to receive the MMR II vaccine when all indications suggested that she not receive it. Such a finding of negligence, if it had been argued by Merck, might have supported a second intervening cause contention. For example, if after

This argument is unavailing for purposes of summary judgment. There can be more than one proximate cause of an injury—and whether any inadequacy in the package circular was a substantial factor in causing harm to Lisa, or whether what Dr. Sharrar did or failed to do caused that harm, or both, is a jury question.

As I discussed in greater detail above, see infra at 260, it is an open question at this point whether Merck acted in accordance with due care when it contracted with the CDC to have the CDC provide a learned intermediary at inoculation or provide a recipient or his parents with an adequate warning. This determination depends on whether Merck foresaw that the CDC would perform its tasks. In a sense, it is a proximate cause issue. If Merck reasonably believed that the CDC would perform its assigned tasks, and it happens that the CDC did not do so, it may be that the CDC's negligence is a superseding cause of Lisa's injuries, because it is its misconduct which may be a substantial factor in bringing about the illness. For example, if the CDC planned to meet its obligation by providing a physician at inoculation, but told the doctor to go to the wrong school, assuming the presence of the doctor would have prevented Lisa's immunization, it could be said that this negligence proximately caused Lisa's illness. I will allow the parties the opportunity to explore further this foreseeability issue.

### 2. Cause-in-fact

In order to maintain duty to warn claims against Merck, the Mazurs must establish that MMR II caused Lisa's injuries.[32] Because the subject matter of this case is of a high degree of scientific complexity, proof of causation must be established by expert testimony. Hamil v. Bashline, 481 Pa. 256, 392 A.2d 1280, 1285 (1978). The Mazurs offer the testimony of two specialists in the fields of pediatrics, virology, and immunology to establish their claim that MMRII caused Lisa's injuries. Essentially, Merck raises three challenges to the Mazurs' causation evidence. The first challenge is in the form of a motion to exclude the Mazurs' proffered experts because they lack the qualifications necessary to meet the threshold admissibility standards of Federal Rules of Evidence 702. Second, Merck contends that Federal Rule of Evidence 703 bars the testimony of the two experts, if they are such, because such testimony is improvidently based upon evidence that is not reasonably relied upon by experts in their respective fields. Third, Merck argues that even if admissible, the Mazurs' proffered expert opinion testimony does not demonstrate the existence of a genuine issue of material fact as to causation.

Kevin C. Geraghty, M.D., is a physician certified in pediatrics and allergy and immunology, and J. Anthony Morris, Ph.D., is a specialist in bacteriology and virology. Both men opine that the MMR II vaccine caused Lisa Mazur to contract SSPE. Affidavits of J. Anthony Morris, Ph.D., and Kevin C. Geraghty, M.D., respectively, Mazurs' exhibits 50 and 25. Merck argues that neither man is qualified to give such an opinion. It correctly points out that neither performed any studies of his own as to the effects of a measles vaccine in humans, had any significant knowledge of SSPE or experience in treating children with SSPE before they were contacted by the Mazurs' attorneys, and had ever exam-

---

reading an adequate package circular, Ms. Frederick knew that Lisa should not have been inoculated for whatever reason, but, nevertheless, negligently allowed her to receive the shot, a reasonable jury could have concluded that Ms. Frederick's negligence was the substantial factor in bringing about Lisa's illness. Of paramount importance to this determination would have been, as it so often is, the element of foreseeability. The intervening negligence would only absolve Merck of liability if it was unforeseeable to Merck at the time it sold the MMR II vaccine to the CDC for use in the Health Department immunization program. See Neal v. Carey Canadian Mines, Ltd., 548 F.Supp. 357 (E.D.Pa. 1982); aff'd Van Bushirk v. Carey Canadian Mines, Ltd., 760 F.2d 481 (3d Cir.1985).

**32.** Although I address the causation question within the context of the Mazurs' duty to warn claims, that question goes to the heart of every claim the Mazurs raise. If the Mazurs cannot prove that MMR II was the cause of Lisa's injuries, all of their other claims will also fall.

ined Lisa before they concluded that her illness was caused by the MMR II inoculation. Moreover, it legitimately questions Dr. Geraghty's experience in the fields of virology, neurology, and epidemiology. Merck's exhibit G at 83–84. Nonetheless, both doctors are fully qualified as experts in their chosen fields. The limited clinical and practical experience both men have had with measles vaccines and SSPE goes to the weight to be afforded their testimony, not its admissibility. The short term, but intense study of SSPE when combined with a specialized understanding of the health hazards associated with immunization is sufficient to qualify them "by knowledge, skill, experience, training, or education" as experts in accordance with Federal Rules of Evidence 702.

Federal Rule of Evidence 703 provides that:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

In *In re Japanese Electronics Products Antitrust Litigation*, 723 F.2d 238, 275–279 (3d Cir.1983), *rev'd on other grounds*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), the Third Circuit adopted a liberal approach to determining what evidence is reasonably relied upon by experts in a particular field. In that case, the Third Circuit further opined that once the trial court finds that the data relied upon is of the kind upon which experts in the field reasonably rely, the trial court should not separately determine the trustworthiness of the data.

The primary focus of a Rule 703 determination is on the soundness of the expert's methodology which leads him to a certain conclusion, rather than on the conclusion itself. *Wells v. Ortho Pharmaceutical*, 788 F.2d 741 (11th Cir.), *cert. denied*, 479 U.S. 950, 107 S.Ct. 437, 93 L.Ed.2d 386 (1986); *Ferebee v. Chevron*

*Chemical Co.*, 736 F.2d 1529, 1535–36 (D.C. Cir.), *cert. denied*, 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984). Merck argues that neither expert's testimony is admissible because neither conducted his own clinical or experimental studies of MMR II and SSPE, neither examined Lisa, and both base their opinions solely upon a short term review of the relevant medical literature. However, there is more than one way to reach an admissible expert opinion. Clinical or epidemiological studies, whether performed by the proffered expert or by other experts in the field, are not an "indispensable element in the presentation of a prima facie drug product liability case" and are not "the sole [permissible] basis for expert opinion." *Lanzilotti v. Merrell Dow Pharmaceuticals Inc.*, No. 82–0183 slip op. at 3, 1986 WL 7832 (E.D.Pa. July 10, 1986). A reasonable expert, in the absence of his own study, could turn to the medical literature in the relevant field as the basis for reaching an opinion. Moreover, in the event that a personal examination of the patient is not possible, reasonable reliance could be placed upon the reports of those doctors who did examine her. That is what both experts did in this situation. Thus, the requirements of Rule 703 have been satisfied.

The final and most persuasive challenge to the Mazurs' causation evidence is that even if both doctors are experts and both followed accepted practices in reaching their opinions, these opinions are unsupported by the studies on which they rely. Stated in legal terms, Merck contends that their opinions do not create a genuine issue of material fact.

Based upon their review of the relevant medical literature, their general understanding of the specialized fields of virology and immunology, and their review of Lisa's medical records, it is the opinion of both doctors with a reasonable degree of medical certainty that Lisa contracted SSPE as a result of the MMR II inoculation. Mazurs' exhibits 25 (Geraghty), 50 and supplemental affidavit (Morris). The opinions are unequivocal.

The medical literature on which they rely, however, does not support their conclusion. A typical statement of causation that the plaintiffs' experts rely on appears in an article by Paul R. Dyken, M.D., where Dr. Dyken states that:

[t]he effect of measles immunization is still not understood, but there are now some suggestions that immunization added to natural infection may create some additional worsening of the SSPE but not an earlier onset. When immunization is added to the effect of natural measles, this may induce the neurologic symptoms and possibly exacerbate them. The possibility that immunization alone produces SSPE exists, but there is no direct supportive evidence.

Dyken, *Subacute Sclerosing Panencephalitis*, Neurology Clinics, Vol 3., No. 1, 183–84 (1985). Like the Dyken article, none of the other articles include any findings that SSPE is caused by measles vaccines, but only that there is a possible causal relationship. *See, e.g.,* Modlin, *et al., Epidemiological Studies of Measles, Measles Vaccine, and Subacute Sclerosing Panencephalitis,* Pediatrics, Vol. 59, No. 4, 509, 511 (1977) ("This study neither proves nor disproves an etiologic relationship between live, attenuated measles vaccine and SSPE.... Likewise, no virologic evidence exists to either prove or disprove an association between measles vaccine viruses and SSPE.... Although far from conclusive, the data here presented suggest that live, attenuated measles vaccine virus may be capable of contributing to the pathogenesis of SSPE.").

In determining whether an expert's opinion is sufficient to withstand a summary judgment motion, a court must undertake a detailed inquiry into the admissibility of the proffered testimony. *See, e.g., In re Agent Orange Product Liability Litigation,* 611 F.Supp. 1223, 1242 (E.D.N.Y.1985), *aff'd on other grounds,* 818 F.2d 187 (2d Cir.1987). Under Fed.R. Evid. 703, an expert is entitled to rely on the research of others and to testify therefrom. While the research and data upon which an expert relies and bases his conclusions need not themselves be admissible into evidence, a court, nonetheless, must inquire into the reliability and foundation of the expert's opinion, thereby assuring its helpfulness to the jury. *See Indian Coffee Corp. v. Procter & Gamble Co.,* 752 F.2d 891, 894–95 (3d Cir.1985). Thus, the fact that a party has produced an expert to support its position does not preclude summary judgment. A court may enter summary judgment against a party who relies on an expert's opinion which is unsubstantiated and based on unsupported assumptions.

*Felgenhauer v. Texaco,* 1987 WL 26592, 1987 U.S. Dist. Lexis 11258 (E.D.Pa. December 1, 1987) (Ditter, J.).

Here, plaintiffs' doctors are basing their opinions that to a reasonable degree of medical certainty MMR II caused Lisa's illness on medical studies that only state there is a possible link between measles vaccine and SSPE. The possibility that there is a cause and effect relationship between the two is not enough. As it is explained in *Hreha v. Benscoter,* 381 Pa. Super. 556, 554 A.2d 525, 527 (1989) (quoting *Kravinsky v. Glover,* 263 Pa.Super. 8, 396 A.2d 1349 (1979)):

[w]hen a party must prove causation through expert testimony the expert must testify with "reasonable certainty" that "in his 'professional opinion, the result in question did come from the cause alleged.'" ... An expert fails this standard of certainty if he testifies " 'that the alleged cause "possibly", or "could have" led to the result, that it "could very properly account" for the result, or even that it was "very highly probable" that it caused the result.'

. . . .

"The issue is not merely one of semantics. There is a logical reason for the rule. The opinion of a[n] ... expert is evidence. If the fact finder chooses to believe it, he can find as fact what the expert gave as an opinion. For a fact finder to award damages for a particular condition to a plaintiff it must find as a fact that the condition was legally caused by the defendant's conduct.... [I]t is

the intent of our law that if the plaintiff's ... expert cannot form an opinion with sufficient certainty so as to make a [professional] judgment, there is nothing on the record with which a [factfinder] can make a decision with sufficient certainty so as to make a legal judgment." (citations omitted)

Although plaintiffs' experts expressed their opinions in the appropriate legal language, their doing so was not justified by their own experience, experiments, or clinical studies. Nor did the studies of others, on which they could and did rely, support the conclusions they expressed.

This does not end the matter, however. Neither Dr. Geraghty nor Dr. Morris said he relied upon *The Merck Manual*, 2041 (Merck Sharp & Dohme Research Laboratories, 15th ed. 1987). Perhaps they should have examined it, for there the epidemiology of SSPE is stated thus: "An altered measles virus, acquired naturally or by *vaccination*, is the *probable cause*." *Id.* (emphasis added). While Drs. Geraghty and Morris were not justified in reaching their conclusion on the basis of what they did consider, what they did not consider could be helpful to them.[33]

## V. CONCLUSION

In summary, I conclude that there is no federal preemption of Pennsylvania tort claims arising out of a vaccine-related injury, that resolution of Merck's statute of limitations defense is a jury question, and, finally, I find that a decision on Merck's motion for partial summary judgment on the failure to warn claims must be reserved until further discovery is finalized and appropriate supplements are submitted to me as specified in the order which follows.

## ORDER

AND NOW, this 29th day of June, 1990, for the reasons set forth in the accompanying opinion, it is hereby ordered that defendant's motion for partial summary judgement and to exclude plaintiffs' expert testimony is denied in part. Summary judgment is denied as to the federal preemption and the statute of limitations issues. Judgment is entered in favor of plaintiffs and against defendant on the issue of federal preemption. I reserve judgment on the motion to exclude plaintiffs' expert testimony and for partial summary judgment concerning plaintiffs' duty to warn claims. The parties shall have sixty days from the date this order is filed to engage in further discovery and to supplement their respective filings, if necessary, on the duty to warn claims.

---

**33.** *The Merck Manual* was not attached as one of the sources either doctor relied upon to reach his opinion. Merck also did not disclose this document to me. This text seems to undermine the credibility of Merck's arguments on causation in its motion for partial summary judgment. If Merck can include the "probable cause" statement in a published medical text, it is hard to understand the enthusiasm with which it challenges the opinions of Drs. Geraghty and Morris. Merck must have had a basis in fact for that statement. If so, Merck should have disclosed that information to the plaintiffs. I am sure it will do so now and the plaintiffs' doctors may wish to give this matter their renewed consideration.